UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANGELO JOSEPH RICCOBONO,

For Online Publication Only

                 Plaintiff,

**MEMORANDUM & ORDER**

      -against-                     17-CV-01371 (JMA)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                 Defendant.
-----------------------------------------------------------------X

**APPEARANCES**

> Sharmine Persaud
> Law Office of Sharmine Persaud
> 675 Broadway
> Massapequa, NY 11758
> *Attorney for Plaintiff*
>
> Sean P. Greene
> United States Attorney's Office, EDNY
> 271-a Cadman Plaza East
> Brooklyn, NY 11201
> *Attorney for Defendant*

**AZRACK, United States District Judge:**

Plaintiff Angelo Joseph Riccobono ("Plaintiff" or "Riccobono") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. Because the ALJ's decision was supported by substantial evidence and applied the proper legal standards, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

# I. BACKGROUND

## A. Procedural History

In February 2014, Plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA"), alleging disability as of May 6, 2013, due to lower back problems. (Tr. 55, 141–42.[1])  He subsequently clarified that his application is also based on issues with his right ankle and arthritis in his knees.  (Tr. 36–37.)  Following denial of his claim, Plaintiff requested a hearing and appeared with his attorney for an administrative hearing before Administrative Law Judge April M. Wexler ("ALJ Wexler") on February 18, 2016.  (Tr. 34–53.)

In a decision dated March 17, 2016, ALJ Wexler denied Plaintiff's claim, finding that he was not disabled for purposes of receiving disability insurance benefits under the Social Security Act because, despite various limitations, Plaintiff can perform his past relevant work.  (Tr. 15–26.)  ALJ Wexler's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on February 2, 2017.  (Tr. 1–5.)  This appeal followed.

## B. Plaintiff's Testimony

Plaintiff was born on September 27, 1959.  (Tr. 35, 141.)  His educational background includes a high school diploma and two years of college; and he previously worked as VP of sales at a commercial moving company and then owner of a commercial moving company.  (Tr. 35–37, 47, 188, 209–16.)  Plaintiff testified that he stopped working due to surgeries on his right ankle, arthritis in his knees, and a back fusion.  (Tr. 36–37.)

Plaintiff engages in a wide-range of activities in his personal life.  Pursuant to his function report dated April 4, 2014, and corroborated at the administrative hearing, Plaintiff generally performs chores around the house, goes to the store, cares for his cat, prepares some meals and

---

[1] Citations to "Tr." refer to pages of the certified administrative record filed by the Commissioner.  (ECF No. 23.)

picks others up from his mother, watches TV, does light cleaning, does laundry, and performs minor repairs at home (some of which take more than one day). (Tr. 40–41, 199–208.) However, he mentioned that he is physically unable to do heavy work required for landscaping and major home repairs. (Tr. 202–03.)

When listing hobbies in his function report, Plaintiff wrote that he plays racquetball and goes to the gym three times a week. (Tr. 203–04.) He stated that he "exercise[s] very cautiously and lift[s] lighter weights and play[s] much slower than before," due to his injuries. (Tr. 203.) However, according to his hearing testimony, at the time of his function report, he was playing softball once a week in addition to playing racquetball three times a week. (Tr. 41–42.) Plaintiff also discussed going out to socialize with others approximately three times a week, including for coffee, dinner, and movies, and that he winters in Florida—testifying that he follows pretty much the same routine in Florida and does not require any assistance at the airport. (Tr. 41, 204.)

Plaintiff did indicate that he has difficulty cleaning himself properly when defecating, and can no longer fish, dance, or go for long walks. (Tr. 201, 204.) He also identified some limitations in sitting, walking, standing, climbing stairs, kneeling, and squatting. (Tr. 204–05.) And, he testified that as of the date of the administrative hearing, February 18, 2016, he had not played racquetball for approximately one year and had not played softball for about 18 months. (Tr. 41–42.) Finally, Plaintiff testified that he needs to lay down and rest after doing errands and generally just watches TV at home in the afternoons. (Tr. 40–41.) However, the only pain medication he takes to treat his apparent disabling pain is Advil "on occasion." (Tr. 39.)

## C. **Relevant Medical Evidence**

Prior to Plaintiff's alleged onset date of May 6, 2013, his medical records identify various MRIs of his right ankle, four right ankle surgeries, and physical therapy for his ankle injury. (Tr.

256–74, 277–99, 387–91, 467–68.) He also underwent an initial evaluation with Dr. Neal Smith on April 24, 2013 for lower back pain. (Tr. 328–30.)

In December 2013, approximately seven months after his alleged onset date, Plaintiff began seeing Dr. Brett Spain for lower back pain. (Tr. 320–22.) At his first appointment, Dr. Spain performed some tests, ordered an MRI, and diagnosed Plaintiff with back pain, lumbar radiculopathy, and degeneration of the lumbar disk. (Tr. 321.) The MRI dated December 19, 2013 revealed:

> T12/L1, L1/2, and L4/5 disc herniations deforming the thecal sac, with L4/5 grade I spondylolisthesis; tight lateral annular tear, bilateral neural foraminal extension and left neural foraminal synovial cyst.
>
> L5/S1, L3/4 and L 2/3 disc bulges with bilateral neural foraminal extension abutting the exiting nerve roots; bilateral neural foraminal narrowing; and superimposed left lateral annual tear and decreased conspicuity on flexon view.

(Tr. 323–24.) At a follow up appointment with Dr. Spain on December 26, 2013, Dr. Spain reviewed the MRI results; discussed a treatment plan including things like rest, NSAIDs, and PT; and told Plaintiff he could "continue racket ball if tolerable." (Tr. 325–27.) Dr. Spain also noted, "PT has not helped."[2] (Tr. 326.)

Plaintiff continued to see Dr. Spain, and other doctors at the same office, through May 2014 for lower back pain. (Tr. 351–77.) Overall, the treatment records show continued pain that was sometimes treated with back injections. (Id.) The records, however, also indicate that Plaintiff has intact muscle strength, normal sensation, normal reflexes, and he "exercise[s] regularly, 20 minutes or more, 3 or more times per week." (Id.) In addition, in December 2014, more than six months after his last visit to the office, Plaintiff underwent a second MRI of his lumbar spine, seemingly upon the direction of Dr. Spain. (Tr. 384–86.) The MRI was compared to the previous

---

[2] Plaintiff testified that he had "tried every physical therapy." (Tr. 38–39.) However, the Court notes that there are no medical records demonstrating that Plaintiff underwent any physical therapy treatment for his back condition.

MRI study and the report indicated:

> Previously identified L4/5 extra spinal synovial cyst within the left L4/5 foramen and right lateral annular tear are not identified. Previously identified L2/3 left lateral annular tear is not identified. L1/2 disc herniation demonstrates interval increase in size compared to prior study with also interval development of Grade I retrolisthesis. Previously identified T12/L1 disc herniation demonstrates configuration more suggestive of disc bulge.

(Tr. 385.) Notably, Plaintiff did not return to Dr. Spain, nor any doctors in his office, for further back treatment after the December 2014 MRI. Further, pursuant to Plaintiff's own testimony, and corroborated by the medical records, Plaintiff was playing racquetball and softball throughout his treatment with Dr. Spain and his colleagues.

Well prior to the December 2014 MRI, Dr. Spain referred Plaintiff to Dr. Aristide Burducea for evaluation of lower back pain.[3] (Tr. 348.) On January 9, 2014, Dr. Burducea performed various tests; diagnosed Plaintiff with lumbar radiculopathy; and recommended lumbar epidural steroid injection, continued physical therapy, and medication treatment. (Tr. 348–50.) Plaintiff received three epidural steroid injections on January 16, January 30, and April 17, 2014. (Tr. 338, 345–46, 357–59.) Plaintiff saw Dr. Burducea twice more in May 2014 for similar complaints of lower back pain. (Tr. 365–71). During these visits, Plaintiff received lumbar facet blocks. (Tr. 366, 370.)

Plaintiff also briefly saw Dr. Alexander Weingarten for pain management. Plaintiff visited Dr. Weingarten three times in September 2014 and Dr. Weingarten completed a medical source statement ("MSS") on December 18, 2014. (Tr. 378–84, 394–99.) Dr. Weingarten opined that Plaintiff met a listing for disorders of the spine. (Tr. 394.) He identified +2 deep tendon reflexes in the left lower extremity and myofascial areas of the right quadratus and gluteal, but found no

---

[3] It appears Dr. Burducea works at the same practice as Dr. Spain. However, in his January 9, 2014 treatment note, Dr. Burducea notes that it is an "initial visit" and that Plaintiff was referred by Dr. Spain. The treatment notes for the other doctor in the same office, Dr. Karen Avanesov, do not have such a notation. (See Tr. 348–50, 362–63.)

motor loss, swelling, weight change, impaired appetite, reflex changes, muscle weakness, muscle atrophy, impaired sleep, or gastritis. (Tr. 395.) He did find that Plaintiff had pain, sensory loss, abnormal gait, muscle spasm, and tenderness. (Id.) Dr. Weingarden then opined that Plaintiff could stoop and crouch for 5 minutes "as per pt.," sit and stand/walk for less than two hours total, and occasionally carry less than ten pounds. (Tr. 296, 398.) He further indicated that Plaintiff would require a job that permitted shifting positions at will and would need to take a five to ten minute break every fifteen minutes. (Tr. 397.) However, in response to one question about the need for Plaintiff to include walking in a work day, Dr. Weingarten stated, "as per patient – not able to work at all." (Tr. 396.)

In September 2014, Plaintiff returned to Dr. Mrozcek, who had performed two of his ankle surgeries prior to his alleged onset date. (Tr. 392–93.) This was Plaintiff's first visit in approximately two years and he reported that he was doing "very well," and had been playing racquetball four times a week, as well as baseball. (Tr. 392.) However, Plaintiff reported that he recently felt a sharp pain when playing racquetball. (Id.) Dr. Mrozcek noted that "[i]n the past, [Plaintiff] had done very well and was extremely active" and recommended that he wear an aircast. (Id.) Plaintiff returned in December 2014 continuing to complain of ankle pain (though he noted that he had been very active on the ankle with sports since his last surgery), and Dr. Mrozcek indicated "for a right arthroscopic debridement with replacement of the DeNovo grafting." (Tr. 393.) Plaintiff underwent this procedure in March 2015. (Tr. 400–01.) There is no record of any follow-up with Dr. Mrozcek.

Plaintiff's 2015 medical records indicate that he saw a neurologist, Dr. Kai-Ming Fu, for a neurosurgical consultation, complaining of lower back pain. (Tr. 438–40.) He underwent a CT exam and, at his follow-up appointment, Dr. Fu recommended surgery. (Tr. 435–36.) Plaintiff

underwent a minimally invasive left-sided sacroiliac joint fusion on July 1, 2015. (Tr. 404–32.) He returned to Dr. Fu two weeks after the surgery, at which time Dr. Fu indicated normal responses to various exams and "pain improved." (Tr. 433–34.) There is no further follow-up with Dr. Fu, and this is the last time in the record Plaintiff visited a doctor for his back ailments, which he acknowledged at the administrative hearing. (Tr. 39.)

Plaintiff did return to Dr. Spain, but this time he complained of knee pain. (Tr. 441–57.) He was treated between September 17, 2015 and November 2, 2015. (Id.) Dr. Spain diagnosed bilateral knee pain and patellofemoral osteoarthritis. (Tr. 443.) Plaintiff received Supartz injections into both knees on October 19, October 26, and November 2, 2015. (Tr. 450, 453, 456.) At the last appointment, Plaintiff reported he was still experiencing relief from the first injection, was not taking medication for pain, and was not going to physical therapy. (Tr. 455.)

On February 3, 2016, Dr. Spain completed a MSS. (Tr. 462–66.) He indicated that Plaintiff's prognosis was poor. (Tr. 462.) Under clinical findings, Dr. Spain observed that Plaintiff's bilateral knee X-rays indicated severe joint space narrowing and he had a positive MRI of the lumbar spine showing herniated discs. (Tr. 459, 463.) Dr. Spain identified Plaintiff's knee and back symptoms (including bilateral knee pain, radiated low back pain, and stiffness), but his opinion in no way references Plaintiff's complaints of ankle pain. (Id.) Nor had Dr. Spain treated Plaintiff for his back symptoms since May 2014, more than a year and a half prior. However, Dr. Spain opined that Plaintiff could walk two city blocks without rest, occasionally twist, stoop (bend), climb ladders and stairs, and push and pull, but could never crouch or squat. (Tr. 464.) In addition, he opined that Plaintiff could sit continuously for thirty minutes at a time and stand continuously for ten minutes, but could only sit about two hours and stand/walk for less than two hours in an eight-hour work day. (Tr. 465.) Dr. Spain stated that Plaintiff would need to take five-

minute walking breaks every twenty minutes and would need to switch positions at will. (Id.) He then opined that Plaintiff could occasionally lift twenty pounds and could never lift fifty points, but he would likely need to be absent from work about twice a month and would need to avoid extreme cold or high-pressure weather. (Tr. 465–66.)

## D. **Vocational Expert Testimony**

Vocational expert Frank Linder (the "VE") reviewed Plaintiff's file and listened to Plaintiff's testimony at the administrative hearing. (Tr. 46–52.) He testified that Plaintiff's past job as VP of sales was equivalent to the Dictionary of Occupational Titles ("DOT") listed job of sales representative. (Tr. 47.) The VE also testified that Plaintiff's duties as owner of a moving company matched with the following DOT listed jobs: (1) carting and moving estimator, (2) loading and unloading supervisor, (3) hand packager, and (4) general manager. (Id.) The VE then testified that the job of general manager had skills that were transferable to two jobs at the sedentary level: personnel manager and employment manager. (Tr. 47–48.)

ALJ Wexler asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who had certain limitations which tracked what she found to be Plaintiff's residual functioning capacity ("RFC") discussed further below. (Tr. 48–49.) The VE testified that this hypothetical individual could perform Plaintiff's past relevant work of sales representative, and two parts of the job Plaintiff performed as an owner: carting and moving estimator, and general manager. (Tr. 49.) He also testified that this hypothetical individual could perform the sedentary jobs of personnel manager and employment manager. (Id.)

## E. **The ALJ's Decision**

ALJ Wexler issued her decision on March 17, 2016, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520. (Tr. 15–26.) At step one, ALJ Wexler

concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 6, 2013. (Tr. 17.) At step two, ALJ Wexler found that Plaintiff has severe impairments of degenerative disc disease of the lumbar spine and degenerative joint disease of the right ankle. (Id.) At step three, ALJ Wexler determined that Plaintiff's impairments, alone or in combination do not meet or medically equal the severity of any of the regulation's listed impairments. (Tr. 18–19.) Specifically, ALJ Wexler considered Listings 1.02, 1.03, and 1.04. (Id.)

ALJ Wexler then addressed step four, first determining Plaintiff's RFC. In considering Plaintiff's limitations, ALJ Wexler spent a great deal of time analyzing Plaintiff's medical records, past statements, and testimony at the administrative hearing. (Tr. 19–25.) ALJ Wexler afforded "no weight" to the statements in the Questionnaire furnished by Dr. Spain regarding Plaintiff's purportedly extremely limited ability to sit, stand, walk, push or pull because they were inconsistent with Plaintiff's statements and treatment records. (Tr. 22–23.) However, ALJ Wexler did credit Dr. Spain's opinion that Plaintiff can only occasionally lift twenty pounds, climb stairs, and stoop/bend, and that he must avoid exposure to extreme cold or high pressure because that part of the opinion was consistent with Plaintiff's statements and treatment records. (Tr. 22–23.)

Regarding Dr. Weingarten's Questionnaire, ALJ Wexler afforded "no weight" to his opinion that Plaintiff's impairment meets the criteria of Listing 1.04A because he indicated that Plaintiff has no motor loss, muscle weakness, or atrophy. (Tr. 23.) And she afforded "little weight" to the remainder of his opinion because he only treated Plaintiff briefly, found mostly negative clinical findings, seemed to rely on Plaintiff's subjective complaints, and there was a lack of corroborating treatment records. (Tr. 23–24.)

This detailed analysis led ALJ Wexler to the conclusion that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that

his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the evidence. (Tr. 19–25.) Accordingly, ALJ Wexler found that Plaintiff had the RFC to perform light work as defined in 20 § C.F.R. 404.1567(b) in that he can occasionally lift twenty pounds and frequently list ten pounds, as well as sit for up to six hours and stand or walk for approximately six hours in an eight-hour day with normal breaks.[4] (Tr. 19.) ALJ Wexler also included that Plaintiff's ability to push/pull is unlimited; that he can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl; he should never climb ropes or scaffolds; and he must avoid exposure to extreme cold or high-pressure weather. (Id.)

Based on the RFC and testimony of the vocational expert, ALJ Wexler concluded at step four that Plaintiff could perform his past relevant work as a sales representative, carting moving estimator, and general manager because such work does not require the performance of work-related activities precluded by Plaintiff's RFC. (Tr. 25–26.) Accordingly, ALJ Wexler found that Plaintiff was not under a disability as defined in the Social Security Act from May 6, 2013 through the date of her decision. (Tr. 26.)

## II. DISCUSSION

### A. Social Security Disability Standard

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is

---

[4] The statutory definition for light work is work which:
> [I]nvolves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 1567(b).

disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting Green–Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).  As part of the fourth step, the Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work.  20 C.F.R. § 404.1520(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do.  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999).

## B.  Scope of Review

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it." State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

## C. Analysis

Plaintiff puts forth four arguments in support of his appeal of ALJ Wexler's decision. First, he argues that ALJ Wexler erred at step three in determining that Plaintiff's impairments did not meet or medically equal a listed impairment. (Pl.'s Mem. 11–15.) Plaintiff then contends that ALJ Wexler failed to properly evaluate the opinions of his treating physician, Dr. Spain. (Id. at 16–20.) Next, Plaintiff argues that ALJ Wexler's finding that he can perform "light work" is not based on substantial evidence. (Id. at 20–22.) Finally, Plaintiff asserts that ALJ Wexler's determination that Plaintiff can perform his past relevant work is not supported by substantial evidence. (Id. at 22–25.) These arguments are unavailing.

### 1. ALJ Wexler Did Not Err in Finding that Plaintiff's Impairments Did Not Meet or Medically Equal a Listed Impairment

At step three Plaintiff bears the burden to establish that his impairments meet or medically equal a listed impairment. See Campbell, 2015 WL 1650942, at *7 (citing Melville, 198 F.3d at 51) (noting that plaintiff bears the burden of proof at the first four steps); see also Sullivan v.

<u>Zebley</u>, 493 U.S. 521, 531 (1990) (requiring plaintiff to present medical findings to prove symptoms equal a listing). Plaintiff contends that the evidence on the record may support a finding that his impairments meet or equal Listing 1.04(A), which requires Plaintiff to show that he has:

> Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P § 1.04A.

Plaintiff's main argument is that because he believes his impairments "may" equal Listing 1.04(A), a medical expert must opine on this point. (<u>See</u> Pl.'s Mem. at 11–15; Pl.'s Reply Mem. at 1–5; Pl.'s Sur-Reply at 1–4.) However, Plaintiff also appears to argue that ALJ Wexler's determination that Plaintiff's impairments do not *meet* Listing 1.04 is not supported by substantial evidence. (Pl.'s Mem. at 12.) Accordingly, the Court will address both arguments.

Plaintiff did not meet his burden to show that his back impairment meets Listing 1.04(A). A review of the record finds no clear muscle weakness, as his tests demonstrate close to full or full strength, nor any reflex or sensory loss.[5] (<u>See</u> Tr. 361–62, 365–66, 395, 436, 459.) Critically, at Plaintiff's post-operative appointment on July 14, 2015, which is the last time Plaintiff visited a doctor for his back ailments, Dr. Fu found that Plaintiff had 5/5 muscle strength, a normal sensation exam, and normal reflexes. (Tr. 433–34.) Moreover, ALJ Wexler specifically considered Listing 1.04 and properly explained why the requirements are not met. (Tr. 18–19.) This determination

---

[5] It is also not clear that Plaintiff's doctors conducted straight-leg raising tests both sitting and supine, as required by Listing 1.04.

was supplemented in later sections of ALJ Wexler's decision, which analyze Plaintiff's medical evidence in detail, and squarely support her decision to afford no weight to Dr. Weingarten's assertion that Plaintiff's impairment meets Listing 1.04(A). See Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982) (per curiam)) (upholding a finding that a listing was not met because the ALJ's decision as a whole and the record before him supported the conclusion).

"For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is equivalent to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan, 493 U.S. at 531 (internal quotations omitted) (emphasis in original); see also 20 C.F.R. § 404.1525(c)(3). Plaintiff's contention that that Dr. Spain's records "document the *apparent presence*" of what he says is the remaining criteria of Listing 1.04(A) simply does not satisfy this burden. (Pl.'s Mem. at 14 (emphasis added).)

Finally, the Court rejects Plaintiff's argument that ALJ Wexler was required to call a medical expert to opine on whether Plaintiff's impairment equaled Listing 1.04(A) for the same reasons outlined in my recent decision, De Gonzalez v. Berryhill, No. 16-CV-06723, 2018 WL 6834474, at *8 (E.D.N.Y. Dec. 28, 2018) (rejecting the same argument because it relies on case law outside this Circuit, misreads the applicable regulations, and would add an unnecessary burden).

Accordingly, ALJ Wexler's determination that Plaintiff's impairment did not meet or medically equal any of the listings in the Appendix was based on substantial evidence and correct legal principles.

### 2. ALJ Wexler Properly Assessed the Opinion of Plaintiff's Treating Physician

Plaintiff contends that ALJ Wexler failed to give the proper weight to the opinion of his treating physician, Dr. Spain. (Pl.'s Mem. 16–20.) According to the "treating physician rule" in effect when Plaintiff filed his application, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will give that opinion "controlling weight." 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). However, an ALJ may discount a treating physician's opinion when the opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record, or the evidence otherwise supports a contrary finding. See 20 C.F.R. § 404.1527(c). The ALJ is required to provide "good reasons" to support her decision not to grant controlling weight to a treating physician's opinion. See Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir. 1998).

As discussed above, in his February 3, 2016 MSS, Dr. Spain opined on various significant limitations in Plaintiff's ability to sit, stand, walk, climb stairs, stoop/bend, push, and pull. (Tr. 462–66.) He also opined that Plaintiff could occasionally lift twenty pounds and could never lift fifty pounds and would need to avoid extreme cold or high-pressure weather. (Tr. 465.) ALJ Wexler afforded no weight to Dr. Spain's opinion regarding Plaintiff's limitations sitting, standing, walking, pushing, or pulling. (Tr. 23.) However, she credited Dr. Spain's opinion that Plaintiff can only occasionally lift twenty pounds, climb stairs, and stoop/bend, and must avoid exposure to extreme cold or high-pressure weather. (Id.)

ALJ Wexler explained that Dr. Spain's opinion concerning Plaintiff's limitations was inconsistent with Plaintiff's testimony and prior statements, which show a broad range of daily

living, limited treatment for pain post-surgery, and that he does not use an assistive device. (Tr. 23.) These are all good reasons and her decision is supported by substantial evidence. Indeed, ALJ Wexler highlighted:

> [I]t strains credulity that the claimant could have this level of limitations while retaining the ability to go out daily, shop, go to restaurants, drive, occasionally cook, do household chores and socialize, much less exercise at his local gym, play racquetball three times per week, and travel by airplane (without assistance at the airport) to Florida, where he spends every winter without apparent medical treatment.

(Tr. 23 n.9; see also Tr. 20, 40–42, 199–204 (recognizing Plaintiff's wide range of activities).) The Court completely agrees with this assessment. And while ALJ Wexler recognized that Plaintiff stopped playing sports approximately 12-18 months prior to the administrative hearing in February 2016, (Tr. 19–20), according to his own testimony (and corroborated by his treatment records), Plaintiff was playing racquetball three times a week and softball once a week well after his alleged disability onset date of May 6, 2013. (See Tr. 41–42.) This refutes Plaintiff's claim that he was disabled as of May 6, 2013, and as ALJ Wexler observed, generally casts doubt on his credibility.

Plaintiff takes issue with the fact that ALJ Wexler did not credit all his qualifying statements about his activity. (Pl.'s Mem. 18.) However, an ALJ has the discretion to evaluate and ultimately not credit a claimant's testimony about the severity of his pain and functional limitations. See Burnette v. Colvin, 564 F. App'x 20, 605, 609 (2d Cir. 2008) (summary order); Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984). Particularly given Plaintiff's significant physical activities well after his alleged onset date, ALJ Wexler's evaluation of Plaintiff's testimony was certainly supported by substantial evidence.

ALJ Wexler also discounted Dr. Spain's opinion because she said he provided medical care for distinct limited periods (from December 2013 to February 2014 and September to November

2015) and there were wide gaps in his treatment. (Tr. 23.) Plaintiff contends that this is based on a misreading of the record and thus, remand is required. (Pl.'s Mem. 17–18.) However, the treatment records that Plaintiff points to in his opening brief were prepared by other physicians in the same practice as Dr. Spain. (See Tr. 360–71.) And, while it appears that Dr. Spain did treat Plaintiff on two additional dates in May 2014, (See Tr. 372–77), ALJ Wexler's slight mischaracterization of Plaintiff's treatment history does not require remand. See Smith v. Berryhill, 740 F. App'x 721, 725 (2d Cir. 2018) (summary order) (upholding ALJ's decision to discount treating physician's opinion despite mischaracterization of Plaintiff's treatment history). Indeed, it is still true that there are significant gaps in Dr. Spain's treatment. He treated Plaintiff regularly for his back pain from December 2013 to February 2014, and then twice in May 2014. (Tr. 320–27, 339–44, 351–53.) Plaintiff did not return to Dr. Spain until September 17, 2015, when he saw him several times over the course of approximately a month and a half for pain in his knees, not his back. (Tr. 441–57.) Accordingly, Dr. Spain's treatment of Plaintiff's newly-occurring knee pain was limited, and his February 3, 2016 MSS opinions were far removed from his intermittent treatment of Plaintiff's back ailments. (Tr. 462–66.) Moreover, Dr. Spain did not treat Plaintiff for any back-related issues after his July 1, 2015 back surgery with Dr. Fu, so he had no first-hand knowledge about how the surgery may have affected Plaintiff's symptoms and prognosis, a seemingly significant factor.[6] (Tr. 404–32.) These factors, combined with Dr. Spain's consistent statements that Plaintiff had a normal gait, and normal range of motion, strength, and stability in the lower extremities, all provide substantial evidence in support of ALJ Wexler decision not to credit the entirety of Dr. Spain's opinion. (See Tr. 23, 320, 349–53.)

---

[6] As noted before, Plaintiff only saw Dr. Fu once following his surgery and Dr. Fu indicated that Plaintiff had normal responses to various exams and that his pain was improved. (Tr. 433–34.). And Plaintiff himself acknowledged that he has not sought any further treatment for his back since the surgery. (Tr. 39.)

### 3. ALJ Wexler's RFC Determination is Supported by Substantial Evidence

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see Crocco v. Berryhill, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis) (citing 20 C.F.R. § 404.1545(b)).

"The Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)). Accordingly, the ALJ's RFC assessment is based on a review of the entire record, including, but not limited to, medical opinions. See 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). An RFC determination must be affirmed on appeal where, as here, it is supported by substantial evidence in the record. Barry, 606 F. App'x. at 622 n.1.

Plaintiff claims that ALJ Wexler's RFC determination that Plaintiff can perform "light work" (together with certain additional limitations) is not supported by substantial evidence because there is no medical evidence supporting this RFC finding. (Pl.'s Mem. 20–22.) However, ALJ Wexler engaged in a detailed analysis of the medical opinion evidence, together with the objective medical and non-medical evidence in the record in formulating Plaintiff's RFC. (See Tr. 19–25.) She properly evaluated the medical opinions of Dr. Spain and Dr. Weingarten and

persuasively explained why she did not adopt their opinions in full.[7]  (See Tr. 23–24.)  And, for the portions of Dr. Spain's opinion that she found persuasive because they were supported by the balance of evidence in the record, she incorporated them into her ultimate RFC determination. (See Tr. 23.)

ALJ Wexler's detailed RFC analysis makes clear that she reviewed and considered the record as a whole, including the medical opinions and treatment notes, together with Plaintiff's statements.  She aptly explained that she incorporated certain additional limitations on top of the statutory "light work" RFC due to Plaintiff's documented ankle and back impairments, supported by both medical evidence and Plaintiff's testimony.  (Tr. 25.)  Conversely, Plaintiff points to no persuasive evidence that he has limitations sitting, standing, or lifting the requisite 10-20 pounds that would preclude light work, and at this step it is his burden to make such a showing.[8]  Smith v. Berryhill, 740 F. App'x 721, 726 (summary order) (2d Cir. 2018); see 20 C.F.R. §§ 404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled . . . ."); 404.1545(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").  Indeed, there is nothing in

---

[7] Plaintiff does not challenge ALJ Wexler's decision not to grant controlling weight to Dr. Weingarten's opinion.  For the avoidance of doubt, the Court finds that ALJ Wexler's reasons—limited treatment, negative treatment findings, reliance on Plaintiff's subjective complaints, and lack of corroborating treatment records—are plainly good reasons to afford little to no weight to his opinion.  (See Tr. 23–24.)

[8] This is particularly important because Plaintiff seemingly argues that there must be a medical opinion to support an RFC finding.  (See Pl.'s Mem. 21–22.)  However, the cases that Plaintiff cites were decided at a time when the Second Circuit required an ALJ to identify a functional assessment to rationalize the RFC at step five—placing the burden of proof on the Commissioner.  See Curry v. Apfel, 209 F.3d 117, 122–23 (2d Cir. 2000).  The Commissioner subsequently amended the regulations to specify that the same RFC assessed at step four would be used at step five and the Second Circuit held that under this standard, the Commissioner need not identify additional evidence of a claimant's RFC at step five, abrogating the Curry standard.  Poupore v. Astrue, 455 F.3d 303, 306 (2d Cir. 2009).  Thus, citing these cases for the type of evidence the Commissioner needs to support an RFC finding is misguided.

19

the record that indicates Plaintiff was ever told to stop or scale back his activities. Instead, Plaintiff stopped seeing his doctors—after his ankle surgery in March 2015, he did not return to Dr. Mrozcek; after his July 2015 back surgery, he only saw Dr. Fu for one follow-up appointment; and he had already stopped treating with Dr. Spain for his back ailments in May 2014, returning only briefly for complaints of knee pain in September 2015. It is thus apparent that ALJ Wexler's common-sense RFC is supported by much more than a "mere scintilla" of evidence.

That the RFC determination does not match a medical opinion does not require remand. See Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."). It was appropriate for ALJ Wexler to rely on the credible parts of Dr. Spain's opinion together with the *overwhelming* evidence in the record that Plaintiff did not have significant physical limitations in formulating her RFC. See Monroe v. Colvin, 676 F. App'x 5, 8–9 (2d Cir. 2017) (summary order) (upholding ALJ decision where the ALJ rejected the treating physician's opinion, but relied on his treatment notes in formulating claimant's RFC); Johnson v. Colvin, 669 F. App'x 44, 46–47 (summary order) (2d Cir. 2016) ("[B]ecause the record contained sufficient other evidence supporting the ALJ's determination and because the ALJ weighed all of that evidence when making his residual functional capacity finding, there was no 'gap' in the record and the ALJ did not rely on his own 'lay opinion.'"). In sum, the Court finds that Plaintiff's application for disability insurance benefits, while still engaging in recreational sports and many other activities was plainly inappropriate, and ALJ Wexler's RFC assessment is supported by substantial evidence.

### 4. ALJ Wexler's Finding that Plaintiff Can Perform His "Past Relevant Work" is Supported by Substantial Evidence

Plaintiff's final argument is that his past work as owner of a commercial moving company and as VP of sales of a moving company were composite jobs so ALJ Wexler's finding that Plaintiff could perform past relevant work as a "sales representative," "carting moving estimator," and "general manager" was in error. (Pl.'s Mem. 22–25.) Composite jobs combine "significant elements of two or more occupations, and, as such, have no counterpart in the DOT." SSR 82-61 (S.S.A. 1982), 1982 WL 31387. Plaintiff claims that his prior work in these "composite jobs" entailed both light and medium exertional duties, so ALJ Wexler's finding is not supported by substantial evidence. (Pl.'s Mem. 22–25.)

Here, the VE testified that Plaintiff's job as owner of a moving company corresponded to four different DOT job titles, but he also testified that Plaintiff's position as VP of sales corresponded to a specific DOT job: sales representative. (Tr. 47.) Accordingly, the Court need not address whether Plaintiff's past position as owner of a moving company is a composite job and whether it was appropriately addressed because the VE testified that Plaintiff's position as VP of sales corresponded to one DOT job. ALJ Wexler properly tracked Plaintiff's RFC in her hypothetical questions to the VE, who testified that a hypothetical individual with Plaintiff's age, educational background, and RFC could perform the DOT sales representative job that corresponded with Plaintiff's past work as VP of sales. (Tr. 47–49.) ALJ Wexler relied on this testimony and compared the physical and mental demands of this work to Plaintiff's RFC in her step four analysis. (Tr. 25–26.) Thus, the step four finding is supported by substantial evidence.

While ALJ Wexler did not continue to the fifth step of the analysis, the VE testified that the same hypothetical individual could perform sedentary jobs as "personnel manager" and "employment manager." (Tr. 49.) Accordingly, even if ALJ Wexler did err in failing to address

that Plaintiff's past work should be considered a "composite job," the Commissioner would have easily sustained her burden at step five that a significant number of jobs exist in the national economy that Plaintiff could perform by relying on this part of the VE's testimony.  See Snyder v. Colvin, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) (citing Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983)).  Any error was thus harmless, and the Court will not remand when the facts in the record would lead to the exact same conclusion.  See Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) ("Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration.").  As is abundantly clear from the record, there is ample evidence to support the determination that Plaintiff was not disabled for purposes of receiving disability insurance benefits under the Social Security Act from May 6, 2013 through March 17, 2016.

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's motion for judgment on the pleadings.  The Clerk of the court is directed to enter judgment in favor of the Commissioner and close the case.

**SO ORDERED.**

Dated: February 11, 2019
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE